# [J-83-2022]
## IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

## TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 856 EDA 2017 |
| | : | dated July 29, 2021, reconsideration |
| v. | : | denied October 13, 2021, reversing |
| | : | the Judgment of Sentence of the |
| | : | Montgomery County Court of |
| NAZEER TAYLOR, | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-CR-0003166-2014 dated |
| Appellee | : | January 31, 2017 and remanding. |
| | : | |
| | : | ARGUED: November 30, 2022 |
| | : | |

## OPINION

**CHIEF JUSTICE TODD**                    **DECIDED: January 29, 2024**

In a previous appeal in this matter, we held that the juvenile court violated Appellee Nazeer Taylor's Fifth Amendment[1] right to be free from compulsory self-incrimination by considering his refusal to admit guilt for the criminal offenses which he was alleged to have committed as a juvenile in granting the Commonwealth's petition to transfer Taylor's case to adult criminal court. *See Commonwealth v. Taylor*, 230 A.3d 1050 (Pa. 2020) ("*Taylor II*"). We are now asked to decide whether this violation of Taylor's constitutional

---

[1] This amendment to the United States Constitution provides, in relevant part, that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

right is subject to appellate review for harmless error.  For the reasons that follow, we conclude that it is not – that, rather, it constitutes structural error.

Were Taylor still a juvenile, he would be entitled to a new certification hearing because of this violation of his Fifth Amendment right.  However, as we further explain herein, because Taylor is now 27 years of age, and therefore no longer subject to the jurisdiction of the Juvenile Division of the Montgomery County Court of Common Pleas, neither that court nor, alternatively, the Criminal Division of the Court of Common Pleas of Montgomery County has the statutory authority to conduct such a hearing.  We are therefore obliged to follow the law as presently written and, accordingly, affirm the order of the Superior Court which reversed Taylor's conviction and discharge him.

## I.  Factual and Procedural History

From July 2012 through August 2013, Taylor, who was born on September 12, 1996, lived in a foster home in Montgomery County.[2]  In March 2014, the Commonwealth filed a petition in the Juvenile Division of the Montgomery County Court of Common Pleas, alleging that Taylor, then 17 years old, was delinquent of the felony offenses of rape of a child, involuntary deviate sexual intercourse with a child, and sexual assault.[3]  Subsequently, the Commonwealth filed a petition with the juvenile court to have Taylor's case transferred to adult criminal court.

The Honorable Joseph A. Smyth of the Juvenile Division of the Montgomery County Court of Common Pleas conducted a certification hearing on the petition which took place over the course of two separate days — April 2 and April 25, 2014.  At this hearing, Judge Smyth heard testimony from the victim that Taylor had orally and anally sodomized him on several occasions, causing physical injury which affected his ability to

---

[2]  These facts surrounding Taylor's criminal charges and the procedural history of this matter have been previously recounted in our opinion in *Taylor II*.
[3]  18 Pa.C.S. §§ 3121(a)(2) & (c), 3123(a)(1) & (b), and 3124.1, respectively.

control his bowels. N.T., 4/2/14, at 9, 11-30, 33. Taylor's foster mother also offered testimony as to her observations of certain incidents which caused her to become suspicious that Taylor and the victim had engaged in sexual activity. *Id.* at 79-80, 84-85. Because of this testimony, the juvenile court found that the Commonwealth had established a *prima facie* case that Taylor committed the offenses alleged in the delinquency petition. *Id.* at 114-15.

Due to the fact that Taylor was 15 years old at the time he allegedly committed the offenses, and had been previously adjudicated delinquent of burglary — an offense graded as a felony for purposes of adult criminal prosecutions — the burden of proof shifted to Taylor under the Juvenile Act[4] to prove by a preponderance of evidence that retention of the case by the juvenile court "serve[d] the public interest and that [he was] amenable to treatment, supervision or rehabilitation as a juvenile." 42 Pa.C.S. § 6355(g).

On these points, the Commonwealth presented testimony from a supervisor with the Montgomery County Juvenile Probation Department regarding Taylor's amenability to treatment and available treatment options in the juvenile and adult systems. The probation supervisor expressed his belief that Taylor was not amenable to treatment in the juvenile system, noting that Taylor committed the assaults after receiving therapy as the result of the burglary conviction, as well as the fact that sex offender therapy usually took a minimum of two years, and the juvenile system would have jurisdiction over Taylor for only one year after he completed such a treatment program. N.T., 4/25/14, at 89-91.

Taylor presented the testimony of Dr. Nicole Machinski, a licensed clinical psychologist who specializes in the forensic assessment and treatment of juvenile sex offenders. *Id.* at 4, 9. Dr. Machinski had conducted her own in-person interview of Taylor, and she reviewed his extensive history of trauma and attendant psychological problems

---

[4] 42 Pa.C.S. §§ 6301-6375.

stemming from neglect and his own physical and sexual abuse at the hands of his uncle. *Id.* at 14-15. She observed, however, that as the result of receiving mental health treatment, he had made progress in dealing with these problems, and his behavior had improved. *Id.* at 16-20. Dr. Machinski opined that Taylor "could certainly be treated" within the juvenile justice system, either on an inpatient or outpatient basis, given that such treatment programs "are usually, on average, about 12 months," and that Taylor would be under the supervision of the juvenile system for the next 3 years. *Id.* at 22.

As our Court observed in *Taylor II*, the Commonwealth attempted to rebut Dr. Machinski's conclusion that Taylor was amenable to treatment by relying on the fact that he did not admit to having committed the alleged assaults, nor did he otherwise take responsibility for his alleged actions. As we noted:

> Specifically, the Commonwealth suggested that Taylor was "in denial" of his need for treatment, prompting a defense objection, which the court sustained. *Id.* at 44. The Commonwealth subsequently posited that "the first step in sex offender treatment [is] admitting guilt," *id.* at 58, and, after the close of evidence, reiterated its view that Taylor was "in denial" and that an "admission" would be necessary for treatment to work in this case. *Id.* at 109.

*Taylor II,* 230 A.3d at 1054.

At the conclusion of the hearing, Judge Smyth orally granted the transfer petition and certified the case to the Montgomery County Court of Common Pleas, Criminal Division, for trial. At that time, Judge Smyth explained why he did not consider Taylor to be amenable to treatment in the juvenile system. One of the principal reasons he cited was the fact that Taylor refused to admit to committing the sex offenses at issue:

> And they won't admit that he's committed the sex offense, and that's sort of their conundrum, because time is of the essence. He's approaching 18 years old. The act -- you can argue degree of sophistication all you want, but it was a

predatory damaging act that occurred repeatedly over a 1-year period of time.

If you're going to go on the sex offenders' treatment, it's important that you admit, No. 1; examine your triggers, No. 2; talk about how you can avoid your triggers; and identify up-front the depth of the problem. And here, we can't identify the depth of the problem largely because we're not admitting yet that there is a problem.

What if he were to sit there for a year and a half before he finally admitted that he did something? I mean, I assume he's still denying. Counsel's arguments have been phrased "if this is true, it's a horrendous act."

They made a distinction when he denied, when he said to Dr. Buxbaum -- I believe he was a psychiatrist -- "I didn't do anything wrong." Counsel said now he wants to say he participates in treatment and defense counsel argued, well, maybe the treatment's not talking about sex offenders' treatment. And that's the very issue, though, is he amenable to sex offenders' treatment? And, in the juvenile system, time is running out. As I said, there is only a few years left, and the depth -- and if he doesn't make sufficient progress, he's 21, he's back on the streets, and he's released from the jurisdiction of the Court with no supervision at all. That's the dilemma.

And when Dr. Machinski in her report indicates the issues that he needs treatment in and the Commonwealth argues, well, none of this has to do with amenability within the statute, well, it might, when you have four other categories. It would certainly refer to amenability for a crime that's much less serious than this. But I don't know that it means anything with regard to somebody who's committed the type of act that he's alleged to have committed.

So for all the reasons in the statute as enumerated by [the Commonwealth] and because it's the defense burden of proof, I'm going to grant the Commonwealth's motion to certify him to adult court.

N.T., 4/25/14, at 113-15.

The case was transferred, and in June 2016, after a jury trial before the Honorable

William Carpenter, Taylor was convicted of the aforementioned charges. On January 31,

2017, he was sentenced to 10 to 25 years imprisonment, plus 10 years of probation. Taylor filed a post-sentence motion arguing, *inter alia*, that the juvenile court erred by certifying his case based on his refusal to admit to committing the sexual acts which were the subject of the delinquency petition, and which he contended violated his right under the Fifth Amendment to the United States Constitution to be free from compulsory self-incrimination. Judge Carpenter denied the motion.

Taylor appealed to the Superior Court raising, *inter alia*, his Fifth Amendment claim. A three-judge panel of the Superior Court rejected the claim in an unpublished memorandum decision. *Commonwealth v. Taylor*, No. 856 EDA 2017 (Pa. Super. filed Sept. 10, 2018) (unpublished memorandum) ("*Taylor I*").[5]

Relying on its decision in *Commonwealth v. Brown*, 26 A.3d 485 (Pa. Super. 2011) (holding that it is a violation of a juvenile's Fifth Amendment right to be free of compulsory self-incrimination to require that the juvenile admit guilt for criminal offenses alleged in a delinquency petition in order to prove his or her amenability to treatment in the juvenile system), the court acknowledged that the juvenile court erred in relying on Taylor's failure to admit guilt, and in finding that such an admission was a necessary step for him to obtain sex offender treatment in the juvenile system. Nevertheless, the court concluded that, based on the totality of the evidence presented at the certification hearing, the juvenile court did not abuse its discretion in transferring Taylor's case to criminal court.

Taylor sought allowance of appeal from our Court, which we granted to consider the issue of whether the transfer of a juvenile matter to criminal court based, in part, on the juvenile's refusal to admit guilt constituted a violation of the juvenile's Fifth Amendment right to be free from compulsory self-incrimination. Ultimately, we reversed

_____

[5] The panel decision was authored by Judge Maria McLaughlin and joined by Judge John Musmanno, with Judge Mary Jane Bowes concurring in the result. Therein, the court also rejected two other claims Taylor raised, but which are not at issue herein.

the decision of the Superior Court and remanded this case to that tribunal for further proceedings. In our decision – *Taylor II* – our Court unanimously adopted the Superior Court's conclusion in *Brown* that the protections of the Fifth Amendment are applicable to juvenile transfer proceedings. We held:

> [T]he Juvenile Act does not countenance the drawing of an adverse inference from a juvenile's refusal to admit to the offenses with which the juvenile is charged. When faced with a critical decision such as whether to certify a juvenile for transfer to an adult court for prosecution, a court may not condition its ruling upon the minor's assertions of innocence or invocation of the Fifth Amendment. To do so would place too high a cost on the juvenile's constitutional privilege against compulsory self-incrimination, guaranteed by the Fifth Amendment.
>
> * * *
>
> Simply put, a minor's refusal to confess to an act for which he or she might be criminally prosecuted as an adult may not be considered when deciding whether to certify a case for transfer between juvenile and adult court. This remains true irrespective of the necessary considerations of amenability to treatment contemplated by the Juvenile Act or of the possibility of immunity contained therein. As there is no way to guarantee that certification would be denied, or decertification granted, upon an admission of guilt, a minor cannot be expected to take so broad a leap of faith.

*Taylor II*, 230 A.3d at 1071-72.

However, our Court was divided on the question of the appropriate remedy. Justice Wecht, writing for the majority, opined that the United States Supreme Court had never fashioned a remedy for this type of constitutional violation "in this rare context." *Id.* at 1073.[6] Moreover, he noted that we lacked advocacy on the question of whether this

---

[6] This portion of Justice Wecht's opinion was joined by this author, as well as then-Chief Justice Saylor and Justice Mundy.

violation was of the type the high Court considers to be a "structural error," or one which is subject to a harmless error review by an appellate court.[7]  *Id.*

The majority concluded that remand of this matter to the Superior Court was appropriate so it could determine, in the first instance, whether the juvenile court's violation of Taylor's Fifth Amendment right constituted a structural error, or was amenable to a harmless error analysis.  Our Court further directed that, if the Superior Court determined the harmless error doctrine was not applicable, or if the harmless error doctrine did apply but the error could not be deemed harmless, the court was to consider what relief was available.  *Id*. at 1073.

Then-Justice Baer authored a dissent as to this portion of the opinion, which was joined by Justices Donohue and Dougherty.  Justice Baer espoused the view that the juvenile court's reliance on a constitutionally impermissible factor in making its decision to transfer Taylor's case to adult criminal court was prejudicial, and, as a consequence, the judgment of the Superior Court affirming that disposition was erroneous and should simply be reversed.

---

[7] As discussed more fully herein, the United States Supreme Court has broadly described structural errors as "structural defects in the constitution of the trial mechanism." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).  Hence, "[s]tructural errors are errors that affect the 'entire conduct of the [proceeding] from beginning to end.'" *Greer v. United States*, 141 S.Ct. 2090, 2100 (2021) (quoting *Fulminante*, 499 U.S. at 309).  A constitutional violation which is a structural error necessitates the automatic reversal of a defendant's criminal conviction on appeal and the grant of a new trial. *Id.* at 2099.

By contrast, the high Court categorizes harmless errors as "errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman v. California*, 386 U.S. 18, 22 (1967).  In *Chapman*, the Court recognized that even a federal constitutional violation may fall within this category of "unimportant and insignificant" errors, such that it does not require automatic reversal of a criminal conviction. *Id.* However, in order for a federal constitutional violation to be classified as harmless, the government must "show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907 (2017) (quoting *Chapman*, 386 U.S. at 24).

Further, with respect to the proper remedy for the juvenile court's violation of Taylor's Fifth Amendment right, Justice Baer noted that Taylor had, by the time of our decision, reached the age of 21. He opined that Taylor could not be tried in adult criminal court because his crimes occurred while he was a juvenile, nor could his case be transferred back to the juvenile court for new certification proceedings due to the fact that that court lost jurisdiction over Taylor when he reached the age of 21. Hence, Justice Baer would have directed that Taylor be discharged, provided no other criminal charges were pending against him that would be required to be tried in the adult criminal court system.

On remand, this matter was assigned to the same Superior Court panel which heard Taylor's original appeal from his judgment of sentence, and it received additional briefing from Taylor and the Commonwealth. In its decision, *Commonwealth v. Taylor*, No. 856 EDA 2017 (Pa. Super. filed July 29, 2021) (unpublished memorandum) (*"Taylor III"*),[8] the court first considered the question of whether the juvenile court's denial of Taylor's Fifth Amendment right to be free from compulsory self-incrimination constituted a structural error, or was susceptible to a harmless error analysis.

The court reviewed relevant cases from the United States Supreme Court establishing when an error committed during a criminal proceeding is of such gravity that it should be considered structural in nature, such as *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018) (holding that defense counsel's admission at trial that his client was guilty, over the client's objection, which violated the defendant's Sixth Amendment right to counsel, was a structural error because it affected the framework within which the trial proceeded and was not an error in the trial process itself).

---

[8] Just as in its prior decision in *Taylor I*, this decision was authored by Judge Maria McLaughlin and again joined by Judge John Musmanno. Once more, Judge Mary Jane Bowes concurred in the result.

The court also examined cases from our Court holding that violations of certain constitutional rights, or Pennsylvania statutes, are so prejudicial that they are not subject to a harmless error analysis, and are "*per se*" reversible error. *See Taylor III*, slip op. at 13-16 (discussing *Commonwealth v. Lewis*, 598 A.2d 975 (Pa. 1991) (failure of trial court to give a no adverse inference instruction to the jury regarding a defendant's failure to testify, even though the instruction was requested); *Commonwealth v. Edwards*, 637 A.2d 259, 260-61 (Pa. 1993) (giving of a "no-adverse-inference" jury instruction regarding the defendant's failure to testify at trial over defendant's objection); *Commonwealth v. Kelly*, 724 A.2d 909, 913 (Pa. 1999) (trial court's use of a mandatory presumption which permitted the jury to conclude a material element of a criminal offense had been met without requiring the Commonwealth to have proven that element beyond a reasonable doubt); *Commonwealth v. Bethea*, 379 A.2d 102 (Pa. 1977) (sentencing judge's improper reliance on defendant's exercise of his constitutional right to a jury trial as a reason for choosing the sentence which it imposed); and *In the Interest of J.M.G.*, 229 A.3d 571, 583 (Pa. 2020) (violation of the psychotherapist-patient privilege by admission of report made by juvenile's treating psychiatrist in evidentiary record relied on by the trial court to order the juvenile's involuntary civil commitment for mental health treatment as a sexually violent delinquent child under "Act 21"[9])). Applying the principles derived from these cases, the court concluded that the juvenile court's denial of Taylor's Fifth Amendment right was a structural error.

The court highlighted that the Fifth Amendment right to be free from compulsory self-incrimination does not just protect against the prospect of an erroneous conviction, but serves another interest — namely, the foundational precept that a person should not be compelled to offer testimony by the threat that his refusal to do so will be held against

---

[9]  42 Pa.C.S. §§ 6401-6409.

him. Here, the court reasoned that the juvenile court presented Taylor with what amounted to the quintessential "Hobson's choice," either admit his guilt at the certification hearing and risk having the admission used against him if the case is transferred to criminal court, or remain silent and have his silence held against him by the juvenile court in deciding whether to certify his case for trial in criminal court. The court considered this untenable choice to be functionally equivalent to the constitutional violation occasioned by a court's failure to inform a jury that it may not draw an adverse inference from a defendant's silence, and it reasoned that when a juvenile court erroneously relies on this impermissible consideration, it becomes "intertwined with the decision to certify the case, [and] can never be harmless." *Taylor III*, slip op. at 18-19.

The Superior Court next considered the appropriate remedy. The Commonwealth, in its supplemental briefing, argued that the court should remand the case to the court of common pleas for a new certification hearing. The Commonwealth contended that this would be akin to what the United States Supreme Court did to cure an improper waiver of a juvenile's case to adult criminal court in the case of *Kent v. United States*, 383 U.S. 541 (1966),[10] discussed at greater length herein, and that such a course of action was appropriate because "the structure of District of Columbia and Pennsylvania laws in this regard are similar, and . . . should be interpreted similarly." *Taylor III*, slip op. at 21.

---

[10] Briefly, in *Kent*, a juvenile who was arrested in the District of Columbia (D.C.) and charged with multiple crimes had his case "waived" to adult criminal court by a juvenile court judge who did not hold a hearing or appoint counsel for the juvenile. After the juvenile was tried and convicted, the high Court reversed his conviction because of the judge's violation of the juvenile's right to counsel and due process; however, because the juvenile was over 21, a remand to juvenile court was not possible. Nevertheless, due to the fact that, under the unique structure of the D.C. court system, the D.C. district court which heard adult criminal matters was statutorily empowered to also act as a juvenile court, the high Court remanded the case to the district court to conduct a new hearing to determine if waiver was appropriate.

In the instant matter, the Commonwealth argued to the Superior Court that this matter could similarly be remanded to the criminal division of the court of common pleas to conduct a new certification hearing. The Commonwealth posited that, because Article V, Section 5 of the Pennsylvania Constitution[11] confers unlimited jurisdiction on the court of common pleas (except as otherwise provided by law), and because 42 Pa.C.S. § 952[12] vests each division of the court of common pleas "with the full jurisdiction of the whole court," *Taylor III*, slip op. at 22, in situations where a particular division of the court of common pleas which has been assigned jurisdiction over a particular kind of case is unavailable, then another division may assume jurisdiction, unless the law provides otherwise. The Commonwealth asserted that, because the juvenile division of the court of common pleas was not available to conduct Taylor's certification hearing, the criminal division could therefore conduct the hearing.

The Superior Court, however, declined to follow this course of action based on our Court's decision in *Commonwealth v. Johnson*, 669 A.2d 315 (Pa. 1995) (holding that a transfer of a case by the criminal division of the court of common pleas to the juvenile

___

[11] This amendment states:

> There shall be one court of common pleas for each judicial district (a) having such divisions and consisting of such number of judges as shall be provided by law, one of whom shall be the president judge; and (b) having unlimited original jurisdiction in all cases except as may otherwise be provided by law.

Pa. Const. art. V, § 5.

[12] This section provides:

> The divisions of a court of common pleas are administrative units composed of those judges of the court responsible for the transaction of specified classes of the business of the court. In a court of common pleas having two or more divisions each division of the court is vested with the full jurisdiction of the whole court, but the business of the court may be allocated among the divisions of the court by or pursuant to general rules.

42 Pa.C.S. § 952.

division of that court was proper under 42 Pa.C.S. § 6322[13] because the criminal court had jurisdiction to consider the petition,[14] and the evidence of record supported its transfer decision). The court interpreted this decision as establishing that the criminal division of the court of common pleas has no jurisdiction to conduct juvenile certification hearings, citing our conclusion in that case that, through the Juvenile Act, the legislature had conferred "limited and exclusive jurisdiction in [the Juvenile Division] of the Court of Common Pleas, in order to meet the special needs of our youth." *Taylor III*, slip op. at 28

---

[13] This statute provides:

> **(a) General rule.--**Except as provided in 75 Pa.C.S. § 6303 (relating to rights and liabilities of minors) or in the event the child is charged with murder or any of the offenses excluded by paragraph (2)(ii) or (iii) of the definition of "delinquent act" in section 6302 (relating to definitions) or has been found guilty in a criminal proceeding, if it appears to the court in a criminal proceeding that the defendant is a child, this chapter shall immediately become applicable, and the court shall forthwith halt further criminal proceedings, and, where appropriate, transfer the case to the division or a judge of the court assigned to conduct juvenile hearings, together with a copy of the accusatory pleading and other papers, documents, and transcripts of testimony relating to the case. If it appears to the court in a criminal proceeding charging murder or any of the offenses excluded by paragraph (2)(ii) or (iii) of the definition of "delinquent act" in section 6302, that the defendant is a child, the case may similarly be transferred and the provisions of this chapter applied. In determining whether to transfer a case charging murder or any of the offenses excluded from the definition of "delinquent act" in section 6302, the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest. In determining whether the child has so established that the transfer will serve the public interest, the court shall consider the factors contained in section 6355(a)(4)(iii) (relating to transfer to criminal proceedings).

42 Pa.C.S. § 6322.

[14] Such petitions are known as "decertification" petitions. *Commonwealth v. Green*, 291 A.3d 317, 318 n.1 (Pa. 2023).

(quoting *Johnson*, 669 A.2d at 320) (emphasis deleted). (We discuss *Johnson* further below.)

The Superior Court opined that, under Section 6303(a)(1)-(2) of the Juvenile Act,[15] the juvenile division of the court of common pleas has exclusive jurisdiction to decide whether to transfer a matter to the criminal division of that court. However, it concluded that, because Taylor was over 21, the juvenile court no longer had jurisdiction over him under 42 Pa.C.S. § 6302,[16] and it could not conduct another certification hearing. The Superior Court further found that, because the initial certification was improper, the court of common pleas did not have jurisdiction to try Taylor, given our Court's holding in *Johnson* that transfer orders between the juvenile and criminal divisions are jurisdictional in nature, and if an order transferring a case is improper, jurisdiction never vests in the receiving court. *Taylor III*, slip op. at 30 (citing *Johnson*, 669 A.2d at 321). The court reasoned that, because the General Assembly did not create any type of statutory framework to provide a court with jurisdiction to conduct a certification hearing for an individual in Taylor's situation — where a certification order is reversed on appeal but the juvenile turns 21 before the appellate process is completed — and because the court deemed it lacked authority to create such jurisdiction of its own volition, it ultimately

---

[15] This section provides:

> **(a) General rule.--**This chapter shall apply exclusively to the following:
> (1) Proceedings in which a child is alleged to be delinquent or dependent.
> (2) Transfers under section 6322 (relating to transfer from criminal proceedings).

42 Pa.C.S. § 6303.

[16] This provision defines a "child" who is subject to the Act, in relevant part, as:

> An individual who:
> (1) is under the age of 18 years; [or]
> (2) is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years[.]

42 Pa.C.S. § 6302.

concluded that dismissal was the only appropriate remedy; accordingly, it reversed Taylor's judgment of sentence and discharged him. *Id.*

The Commonwealth subsequently petitioned our Court for allowance of appeal, which we granted,[17] in order to consider two questions: Whether the juvenile court's erroneous reliance on Taylor's refusal to waive his Fifth Amendment right to be free from compulsory self-incrimination in its certification decision constituted structural error, or was subject to review under a harmless error standard; and, if the juvenile court committed reversible error, what was the appropriate remedy?

## II. Nature of the error committed by the juvenile court

We first address the question regarding the nature of the juvenile court's error in impermissibly considering Taylor's refusal to admit guilt as a basis for its decision to transfer his case to the criminal court.

### A. Arguments

The Commonwealth contends that the juvenile court's violation of Taylor's Fifth Amendment right does not fit into the limited category of deprivations of constitutional rights which the United States Supreme Court has regarded as structural error and, hence, incapable of remedy through a harmless error analysis. In this regard, the Commonwealth highlights that, in *Fulminante*, *supra*, the high Court grouped constitutional errors into two classes: (1) those which occur during the presentation of evidence in a criminal trial to the jury, and, thus, are capable of being "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt;" and (2) those which are "structural defects in the constitution of the trial mechanism . . . affecting the framework within which

---

[17] *Commonwealth v. Taylor*, 275 A.3d 484, 485 (Pa. 2022) (order).

the trial proceeds, rather than simply an error in the trial process itself." Commonwealth Brief at 43-44 (quoting *Fulminante*, 499 U.S. at 308, 309-10).

The Commonwealth develops that, subsequent to *Fulminante*, in *McCoy*, *supra*, the United States Supreme Court further described three subcategories of errors that might be considered structural in accord with *Fulminante* because, according to the Commonwealth's interpretation, they potentially impact the whole process of a trial, not just a portion of it: (1) errors affecting a right that is not just intended to protect a defendant from erroneous conviction, but a right which "protects some other interest, such as the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty;" (2) errors whose "effects are too hard to measure, as is true of the right to counsel of choice;" and (3) "where the error will inevitably signal fundamental unfairness, as . . . a judge's failure to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt." *Id.* at 44-45 (quoting *McCoy*, 138 S.Ct. at 1511) (internal quotation marks omitted).

The Commonwealth posits that, under these criteria, the juvenile court's constitutional violation in this matter was subject to a harmless error analysis because it was, in the Commonwealth's view, "simply an error in the . . . process itself, capable of quantitative assessment, and not a structural defect affecting the framework in which the proceeding took place." *Id.* at 47 (internal quotation marks omitted).

Specifically, the Commonwealth argues that, of the seven factors enumerated by Section 6355(a)(4)(iii) the Juvenile Act[18] which a juvenile court must weigh in determining

---

[18] This portion of the Juvenile Act provides:

> **(a) General rule.**--After a petition has been filed alleging delinquency based on conduct which is designated a crime or public offense under the laws, including local ordinances, of this Commonwealth, the court before hearing the petition on its merits may rule that this chapter is not applicable and that

(continued…)

the offense should be prosecuted, and transfer the offense, where appropriate, to the division or a judge of the court assigned to conduct criminal proceedings, for prosecution of the offense if all of the following exist:

* * *

(4) The court finds:

* * *

(iii) that there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution. In determining whether the public interest can be served, the court shall consider the following factors:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(continued…)

whether a juvenile has met the burden of showing that his or her case should remain in the juvenile system, the trial court's erroneous consideration of Taylor's refusal to waive his Fifth Amendment right affected only two of them: the degree of his culpability, and his amenability to treatment, supervision, and rehabilitation. However, the Commonwealth asserts that this error did not impact the juvenile court's consideration of the remaining five factors, which the Commonwealth maintains did not depend on whether he actually committed the crime and were, in and of themselves, sufficient to justify the transfer of his case to adult criminal court. Hence, the Commonwealth reasons that the requirement that Taylor admit his guilt is the type of error which the high Court would view as harmless, given that it was merely an error in process, and did not affect the framework of the overall certification analysis.

The Commonwealth distinguishes this matter from the types of errors the high Court deemed structural in prior cases, such as the use of a coerced confession at trial, *Payne v. Arkansas*, 356 U.S. 560 (1958), the denial of the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335 (1963), and a judge presiding over a trial who was not impartial, *Tumey v. Ohio*, 273 U.S. 510 (1927), as well as the errors which our Court deemed structural or *per se* in *Lewis*, *Kelly*, and the *Interest of J.M.B.*, *supra,* on the basis that in those cases the defendant's liberty was directly at stake in the proceedings. The Commonwealth asserts that, to the contrary, Taylor's liberty was not directly at stake in the certification hearing since, at most, the result of the error was what actually transpired

---

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;
(VIII) probation or institutional reports, if any;
(IX) any other relevant factors;
* * *

42 Pa.C.S. § 6355 (a).

here — a trial by a jury of his peers at which he had full due process protections. Rather, the Commonwealth characterizes what was ultimately at stake for Taylor as merely "his conditional statutory right to remain in the juvenile system," Commonwealth Brief at 56, and, for this reason also, it argues that our Court should exempt this error from the category of recognized structural errors.[19]

Taylor responds by emphasizing that the type of error the juvenile court committed was, as our Court recognized in our prior opinion, "fundamental." Taylor Brief at 19 (quoting *Taylor II*, 230 A.3d at 1072). Likewise, Taylor highlights that the Superior Court agreed that the violation of his Fifth Amendment right was of the utmost gravity, given that this right is "essential to the criminal justice system," and that it serves not just to

---

[19] The Pennsylvania Attorney General has submitted a thoughtful *amicus* brief tracing the evolution of the harmless error doctrine, which emphasizes that, at one time, all federal constitutional errors were automatically grounds for reversal, but that the modern trend is for reviewing courts to distinguish between structural and trial process errors, in accord with the U.S. Supreme Court's decision in *Chapman*, and its subsequent decisions in *Fulminante* and *McCoy*. The Attorney General suggests that the modern state of the high Court's jurisprudence is to treat most constitutional errors as being subject to a harmless error analysis, with only a few narrow exceptions set out in cases such as *Payne*, *Gideon*, and *Tumey*, *supra*, in which it categorically treated those particular constitutional violations as reversible error.

The Attorney General thus suggests that the error in this case should be treated in a manner that comports with this trend by regarding it as subject to a harmless error analysis, particularly where the high Court has not definitively established that, categorically, a denial of one's Fifth Amendment right is a structural error, and, indeed, in *Fulminante,* deemed other Fifth Amendment violations such as the improper admission into evidence of "involuntary statements or confessions" as subject to a harmless error analysis. *See Fulminante*, 499 U.S. at 310. The Attorney General also maintains that our cases, such as, *Interest of J.M.B.* and *Lewis* are inapposite, as they concern a right protected by a Pennsylvania statute and the right to be protected from compulsory self-incrimination by the Pennsylvania Constitution, respectively, not the United States Constitution.

The Pennsylvania District Attorneys Association also submitted an *amicus* brief supporting the Commonwealth's view that the error in this matter was not structural because, unlike in the other cases relied on by the Superior Court in its decision in *Taylor III* discussed above, Taylor's liberty was not directly affected by the error.

protect against an unfair conviction but to protect "the foundational principle that a person should not face the cruel trilemma of self-accusation, perjury or contempt." *Id.* at 20 (quoting *Taylor III*, slip op. at 17).

Taylor avers that for this reason the error cannot be considered a *de minimis* one, which he contends our Court has specified is the only type of error of this class which may be considered harmless. Taylor likens the error by the juvenile court in his case to the error committed by the trial court in *Lewis* in denying the defendant his requested "no adverse inference" jury instruction. *Id.* Taylor notes we specifically rejected an argument made by the Commonwealth in that case, similar to the argument it makes herein, that, merely because there existed other allegedly overwhelming evidence to justify the ultimate outcome, the gravity of the error could be weighed against that evidence. To the contrary, our Court underscored that, because the constitutional right which was violated in that case – to decline to testify – was "fundamental," *Lewis*, 598 A.2d at 982, the error could never be categorized as harmless, as it was of far greater magnitude than the type of *de minimis* errors which our Court regards as harmless. Taylor contends the error in his case is of the same degree as the error in *Lewis* because it too involved the Fifth Amendment right to not be compelled to incriminate himself. Indeed, in Taylor's view, this error was of even greater impact than the one in *Lewis*, since in that case it was unclear whether the defendant was actually penalized by the finder of fact due to the constitutional violation, whereas, by contrast, in the case at bar "the juvenile court *expressly* and *explicitly* held Taylor's failure to incriminate himself against him." Taylor Brief at 22 (emphasis original).

Taylor develops that, after *Lewis*, our Court's jurisprudence has been consistent in concluding that, whenever a court erroneously deprives an individual of rights that are "so fundamental to our justice system and a fair trial that their violation can never be treated

as harmless error," such an error will be considered structural in nature. *Id.* at 23-24 (discussing *Kelly* and *In the Interest of J.M.G.*). Taylor asserts that, whenever a certifying court violates a juvenile's Fifth Amendment right, this results in the same level of harm as that inflicted by the particular structural errors the high Court identified in *Chapman*, *supra*: the use of a coerced confession at trial, the deprivation of an accused's right to counsel, and the deprivation of an accused's right to an impartial decision-maker.

Taylor argues that, whenever a juvenile court conducting certification proceedings violates a juvenile's Fifth Amendment right in this fashion, it is analogous to coercing an individual into confessing to a crime and then using that confession at trial, given that a juvenile in his position is forced to "admit to the underlying conduct to satisfy the certification court for the opportunity at staying within the juvenile system, knowing that admission would be used at trial by the Commonwealth, or remain silent and have that [exercise of his constitutional right] used against them as a reason for the certification." *Id.* at 24. He reiterates that this type of violation cannot be treated as harmless error, since, as the Superior Court recognized, the reliance by the juvenile court on this fact was "intertwined with the decision to certify the case, and[] similar to a court's failure to inform a jury that it may not draw an adverse inference from a defendant's silence," which is always a structural error. *Id.* at 24-25 (quoting *Taylor III*, slip op. at 19).

Taylor emphasizes that our Court has recognized that, whenever a trial court makes a structural error of this kind, its additional reliance on other valid reasons for rendering a particular decision does not cure that violation. Taylor notes that we underscored this principle in *Commonwealth v. Bethea*, 379 A.2d 102 (Pa. 1977), a case in which a trial court based the defendant's enhanced sentence, in part, on his insistence in proceeding to a jury trial, as was his fundamental right under the United States and

Pennsylvania Constitutions,[20] rather than pleading guilty.  Taylor highlights that our Court reversed the defendant's judgment of sentence, based on our conclusion that the trial court's mere consideration of other proper factors in fashioning its sentence did not cure the trial court's erroneous penalizing of the defendant for the exercise of his constitutional rights.

Taylor further notes that, significantly, the high Court itself in *Kent*, *supra*, categorically rejected the notion that an invalid certification decision by a juvenile court ever can be regarded as harmless.  Taylor Brief at 26 (quoting *Kent*, 383 U.S. at 563-64 ("[T]he [transfer] question was primarily and initially one for the Juvenile Court to decide and its failure to do so in a valid manner cannot be said to be harmless error.")) (emphasis omitted).

Taylor disputes the Commonwealth's assertion that either *Fulminante* or *McCoy* compel a different result.  Taylor points out that *Fulminante*'s keystone principle is that an error will be deemed structural whenever it affects the framework in which the trial itself proceeds, and this is precisely what the juvenile court error did in this case.  In this regard, he offers that the framework of the juvenile court system and the adult criminal court system are fundamentally different:  in the juvenile court system, the juvenile receives a hearing before a juvenile court judge, who renders an adjudication of delinquency, whereas, in the adult system, the juvenile is subjected to a full criminal trial, the result of which may be, as here, a criminal conviction.  Taylor notes also that, under the juvenile system, court supervision ends upon the juvenile attaining the age of 21, whereas in the adult system there is no upper limit to the length of court supervision.  Importantly, Taylor

---

[20] *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Pa. Const. art. I, § 6 ("Trial by jury shall be as heretofore, and the right thereof remain inviolate."); § 9 ("In all criminal prosecutions the accused hath a right to . . . a speedy public trial by an impartial jury of the vicinage . . . .").

stresses that the objectives of the two court systems are fundamentally different, with the juvenile system focused on the supervision, care, and rehabilitation of the juvenile through the employment of a variety of resources. By contrast, rehabilitation is not the primary objective of the adult criminal justice system, which has as its central goal the affixing of criminal responsibility and imposing punishment once a conviction has been rendered after a trial.

With respect to *McCoy*, Taylor argues that his case falls into each of the three classes of errors the high Court suggested therein might constitute structural error. In regards to the first category, he reasons that the error committed by the juvenile court in his case involves a fundamentally important interest separate from merely the prevention of a wrongful conviction, given that it coerced him into waiving his fundamental right against self-incrimination which, as the Superior Court recognized, is a right that also protects an individual from the indignity of being compelled to take the witness stand and provide information which is against his own interest.

Concerning the second class of potential structural errors, in Taylor's view, the effects of the juvenile court's error are simply too difficult to measure for a harmless error analysis to be utilized. He points out that, as a result of the juvenile court's error, he was deprived of three years of rehabilitation and therapy from which he could have benefitted, as well as denied more specialized and focused treatment and supervision programs geared towards his successful re-entry into the community. By contrast, in the adult system, he has been imprisoned with adult offenders and has not received the same rehabilitative treatment, and he now faces 35 years of supervision which is, as he notes, twice as long as he had been alive at the time the delinquency petition was filed. Moreover, Taylor underscores that, absent this error, it is uncertain what the juvenile

court's certification decision would have been, or what the ultimate outcome of a delinquency hearing would have been if one had been held.

Lastly, Taylor asserts that this error "signals a fundamental unfairness that cannot be minimized as an error in process." Taylor Brief at 29. In his view, if the error of the juvenile court is treated as *de minimis*, as the Commonwealth advocates, juveniles seeking to avail themselves of the protections of the juvenile system could be denied those protections by coercion into giving up their fundamental constitutional rights.[21]

---

[21] The Juvenile Law Center, Youth Art and Self-Empowerment Project, and Youth Sentencing and Re-Entry Project have jointly filed an *amicus* brief in support of Taylor's claim that the trial court's constitutionally deficient certification decision was not subject to a harmless error analysis. These *amici* stress that a wrongful certification of a juvenile case to adult criminal court cannot be considered harmless to the juvenile by any measure, due to the fact that such a wrongful transfer irrevocably changes the juvenile's entire experience of the criminal justice process.

Specifically, they note that, when juveniles are detained in adult facilities they experience substantial and unique harms, due to the harsh and brutal conditions existing therein, and they are significantly more likely to suffer sexual and other forms of assault at the hands of inmates. Brief of Juvenile Law Center, *et al.*, at 5 (citing Richard E. Redding, U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, *Juvenile Transfer Laws: An Effective Deterrent to Delinquency?* 7 (June 2010)). *Amici* underscore that even protective measures for juveniles in those facilities can, in and of themselves, be irrevocably damaging to juveniles' mental health, as such measures usually involve long periods of solitary confinement. *Amici* highlight the fact that the overall experience of being incarcerated in an adult facility generally results in an increased risk of suicide for juveniles.

Moreover, *amici* assert that, because adult prisons lack the educational, vocational and social skills training offered by juvenile facilities, the developmental process of juveniles incarcerated in adult prisons is significantly impaired because of their confinement, and the collateral consequences to a juvenile of a conviction and sentence that results from the wrongful certification will greatly harm their future educational and employment prospects.

Additionally, *amici* point out that improper certification strikes at the core constitutional interest of protecting against deprivation of liberty without legal justification, given that juveniles who are tried and convicted for criminal offenses in the adult criminal system are far more likely to be confined, and also to remain confined for longer periods of time, than had they been adjudicated delinquent in the juvenile system for the same offenses.

Further, *amici* highlight substantial social science research which shows that one of the supposed rationales for subjecting juveniles to the adult criminal justice system —
(continued…)

## B. Discussion

With these arguments in mind, we turn now to the question of whether the juvenile court's erroneous reliance on Taylor's refusal to waive his Fifth Amendment right to be free from compulsory self-incrimination in its certification decision constitutes structural error, or is subject to review under a harmless error standard.[22]

Historically, the concept of categorizing errors which occurred in criminal proceedings as harmless for purposes of appellate review grew out of a general prudential recognition that, in order for courts to be able to fulfill their societal duty to administer justice in an orderly and timely fashion, not every error which occurred in the process of a criminal trial necessitated the reversal of the ultimate judgment and remand for an entirely new trial. At one time, in the mid-1800s, appellate review under the English and American common law was equally rigid. Courts in both countries followed what was

---

that they will somehow be deterred by the experience from committing future crimes, thereby making society safer — has not been borne out by actual facts. They note psychological studies show that most juvenile offenders had no knowledge they could be certified to adult court as a consequence of their actions. *See generally* Karen Miner-Romanoff, J.D., Ph.D., *Juvenile Offenders Tried As Adults: What They Know and Implications for Practitioners,* 41 N. Ky. L. Rev. 205, 221 (2014) (summarizing research). Thus, given that it is well-recognized that juveniles' decision-making skills, particularly their capability to weigh the potential benefits against potential risks attendant to particular types of conduct, are not well-developed, as recognized by the high Court, *see, e.g. Miller v. Alabama*, 567 U.S. 460, 477 (describing the "hallmark features" attendant to a juvenile's age as "immaturity, impetuosity, and failure to appreciate risks and consequences"), *amici* assert that the prospect of facing adult trial and attendant penalties has minimal effect in deterring juveniles from committing offenses. Indeed, *amici* aver that empirical evidence demonstrates the net result of incarcerating juveniles in adult prisons undermines the goal of enhancing public safety, given that those individuals are *more* likely to commit other criminal offenses after release than individuals facing the same criminal charges whose cases were adjudicated in the juvenile system. Brief of Juvenile Law Center at 12 (citing Redding, *supra*, at 6.).

[22] Since assessing whether an error is structural or subject to the harmless error doctrine presents a pure question of law, our standard of review is *de novo,* and our scope of review is plenary. *In the Interest of J.M.G.*, 229 A.3d at 577.

known as "the Exchequer Rule"[23] which required a new trial be granted automatically whenever a judge erred in admitting or rejecting the admission of a particular item of evidence in a criminal trial, irrespective of what other properly admitted evidence existed to support the verdict. LaFave, 7 Criminal Procedure § 27.6(a) (4th ed. 2022) (hereinafter "LaFave"). The rationale for this rule was a presumption that every such evidentiary error was prejudicial and, thus, required a new trial, as well as the belief that appellate courts should not invade the jury's fact-finding function by discounting the improperly admitted evidence and evaluating whether the remaining evidence was sufficient to establish guilt. *Id.*

English courts subsequently expanded the application of this rule of automatic retrial to cases in which a judge erred in instructing the jury. *Id.* However, the utilization of this rule led to an ever-burgeoning multiplicity of retrials that overwhelmed the English court system, such that it was said that "English litigation 'seemed to survive until the parties expired.'" *Id.* (quoting Goldberg, *Harmless Error: Constitutional Sneak Thief, 71 Journal Criminal Law and Criminology* 421, 422 (1980)). In response to this situation, an Act of Parliament, the Judicature Act of 1873, repudiated the Exchequer Rule and decreed that courts of appeal could not order a new trial based on improper admission of evidence or erroneous jury instructions unless the Court was of the opinion "some substantial wrong or miscarriage has thereby been occasioned." *Id.* Thus, the concept of requiring some showing of prejudice caused by a trial court error became engrafted into the appellate process of English courts.

---

[23] Although it continues to be the subject of debate among legal scholars, the rule was ostensibly so named because it was announced by the English Court of the Exchequer in the case of *Crease v. Barrett*, 149 Eng. Rep. 1353 (Ex. 1835). *See generally* Gessner Harley Harrison, *State v. Harrison, the Harmless Error Doctrine, and Criminal Sentencing in Arizona: Is the Holstun Rule Constitutional?*, 31 Ariz. St. L.J. 1395, 1442 n.44 (1999).

Here in America, however, courts which still adhered closely to English common law in the 1800s, and had begun following the Exchequer Rule at approximately the same time as the English courts, did not abandon the rule even after it had been abrogated in England; to the contrary, they *expanded* it to a wider range of trial errors, particularly in criminal proceedings. *Id.* Thus, reversals of criminal convictions for minor technical defects in some aspects of the trial process, which were not in the nature of constitutional violations, became commonplace. *See*, *e.g.*, *State v. Sheppard*, 39 S.E. 676 (W.V. 1901) (murder trial in which the brief absence of the defendant in the courtroom while a witness was asked to state her name, and that of her husband for the record, even though the same questions were asked of the witness when the defendant was present, necessitated a new trial); *People v. St. Clair*, 56 Cal. 406, 407 (Cal. 1880) (reversing felony criminal conviction because the charge of "larceny" was spelled "Larcey" in the charging indictment).

Gradually, the number of retrials due to these types of errors increased, and, correspondingly, so did criticism of American appellate courts by legal commentators and the public as a whole. LaFave, § 27.6(a); *see also Kotteakos v. United States*, 328 U.S. 750, 759 (1946) (noting that courts of appeal had become viewed as towering "above the trials of criminal cases as impregnable citadels of technicality," and, as a result, "in many jurisdictions . . . criminal trial became a game for sowing reversible error in the record, only to have repeated the same matching of wits when a new trial had been thus obtained"). In response, noted legal figures such as William Howard Taft, Roscoe Pound, and John Wigmore led a crusade to reform these practices. *Kotteakos*, 328 U.S. at 759. Their efforts, which garnered broad public support, were successful, and by the mid-1920s, 18 states and the United States Congress (with respect to federal courts of appeals and the United States Supreme Court) by statute restricted appellate reversals

for harmless errors, *i.e.*, technical errors which did not prejudice a litigant's substantial rights. *Id.* Another 10 states imposed such restrictions through judicial action. LaFave, § 27.6(a).[24] This trend ultimately became a universal tenet of appellate review for non-constitutional errors in state trials, such that, by the mid-1960s, all states had either harmless error statutes or similar court rules.

It was against this historical backdrop that, in 1967, the United States Supreme Court in *Chapman*, *supra*, addressed the question of whether a violation of the United States Constitution in a criminal trial could be considered a harmless error, and, if so, under what circumstances such an error could be designated as such. Prior to this time, the high Court had, upon the finding of a constitutional error in a defendant's criminal trial, always reversed the defendant's conviction and remanded the case for a new trial. However, *Chapman* marked a watershed break from that prior practice.

Therein, the high Court explained that questions of whether violations of state law or state procedure constituted harmless error were purely questions of state law, whereas violations of federal constitutional guarantees required the Court to fashion an appropriate rule to protect all individuals from state infractions of federal constitutional provisions that violated their fundamental federal constitutional rights. *Chapman*, 386 U.S. at 21. The Court then proceeded to articulate what it considered to be the appropriate rule to

---

[24] By this time, our Court was also categorizing certain types of non-constitutional errors which occurred in criminal and civil trials as harmless, *i.e.*, non-prejudicial. *See*, *e.g.*, *Commonwealth v. Lyons*, 129 A. 86, 87 (Pa. 1925) (district attorney's improper question to defendant regarding his arrest for assaulting his wife "did the defendant no possible harm," because defendant's counsel had informed the jury of the arrest in his opening statement); *Hoff v. Kauffman*, 128 A. 120, 122 (Pa. 1925) (acknowledging that pleadings in the case were "unnecessarily verbose," and thus lacked the conciseness required by statute then governing civil claims in Pennsylvania courts, but refusing to reverse a judgment entered after a jury verdict on this basis, because "[t]he error . . . was not a harmful one, and hence there is no reason for a reversal").

determine whether federal constitutional violations in state criminal proceedings constituted harmless error.

The appellant in *Chapman* argued for adoption of a *per se* rule — that federal constitutional violations in criminal proceedings should always be considered harmful. The Court, however, rejected that argument. The Court took judicial notice of the fact that all 50 states, as well as Congress, had adopted harmless error statutes by that time. The Court noted the purpose of these rules was, as discussed above, to "block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Id.* at 22. The Court concluded "that there may be *some* constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of a conviction." *Id.* (emphasis added).

The high Court acknowledged, however, that there were significant adverse consequences which could arise from an overly broad harmless error rule, given that such a rule could "work very unfair and mischievous results when . . . highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one." *Id.* Notably, the Court further recognized that there are "some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 23 (citing as examples *Payne*, *supra* (use of a coerced confession at trial); *Gideon, supra* (the denial of the right to counsel), and *Tumey, supra* (judge who was not impartial presiding over a trial)). However, for federal constitutional violations which were not of this nature, the Court required that the burden of proof be placed on the party claiming the violation was harmless to convince an appellate court that the error "was harmless beyond a reasonable doubt." *Id.* at 24.

With its *Chapman* decision, the high Court thus established that "some" violations of federal constitutional rights would be subject to appellate review under this harmless error standard, except those violations which are "basic to a fair trial." *Id.* at 23. The latter category of violations would, as consistent with its prior jurisprudence, automatically result in the grant of a new trial, given that their effect was to wholly deprive a defendant of his or her right to a fair trial.

In the aftermath of *Chapman*, the high Court further differentiated between these two categories of errors. In *Fulminante*, *supra*, the Court addressed the question of whether the admission of an involuntary confession could be subjected to a harmless error analysis, despite its prior suggestion to the contrary in *Chapman*. The Court, in a 5-4 decision authored by Justice Antonin Scalia, differentiated between a "trial error" – *i.e.*, an "error which occurred during the presentation of the case to the jury," 499 U.S. at 307 – and structural errors – *i.e.*, errors which are "structural defects in the constitution of the trial mechanism," *id.* at 309. The Court found that the former type of error was subject to a harmless error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt," *id.* at 307-08, whereas structural errors, by contrast, defy such analysis given that they affect the entire conduct of the trial from beginning to end, and they deny to the defendant basic constitutional protections which ensure that a criminal trial reliably determines guilt or innocence, and, also, fail to ensure that any punishment imposed as a result of the trial is "fundamentally fair," *id.* at 309-10.[25]

More recently, the high Court clarified that "the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not

---

[25] Ultimately, however, a majority of the Court joined Justice Byron White's separate opinion which found that admission of the coerced confession at issue in the case was not harmless beyond a reasonable doubt.

entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1910 (2017) (quoting *Chapman,* 386 U.S. at 24). Thus, "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* Importantly, the Court, consistent with *Chapman*, emphasized that the core purpose of classifying a constitutional violation as structural in nature and excluding it from harmless error review was to "ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Id.* at 1907.

In accordance with these principles, the Court outlined three categories of constitutional violations which it considered to be structural errors. The first was a violation of a constitutional right that is "not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as, for example, the right of an individual to conduct his or her own defense, inasmuch as impairment of that right contravenes the legal principle undergirding the constitutional guarantee – namely, that a defendant has the fundamental right to make choices regarding the protection of his or her own liberty. *Weaver*, 137 S.Ct. at 1908; *accord McCoy*, 138 S.Ct. at 1511.

The second category concerned those situations where "the effects of the error are simply too hard to measure," for instance, where a defendant is denied the right to proceed with counsel of his or her choosing. *Weaver*, 137 S.Ct. at 1908. The Court reasoned that, in such situations, "the precise effect of the violation cannot be ascertained," and "[b]ecause the government will, as a result, find it almost impossible to show that the error was harmless beyond a reasonable doubt, the efficiency costs of letting the government try to make the showing are unjustified." *Id.* (citation and internal quotation marks omitted); *accord McCoy*, 138 S.Ct. at 1511.

Finally, the Court specified that an error would be "deemed structural if the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. It therefore would be futile for the government to try to show harmlessness." *Weaver* 137 S. Ct. at 1908 (citations omitted). Notably, the Court further underscored that "[t]hese categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural." *Id.*

Our Court has recognized that the *Chapman* standard represents the irreducible minimum standard state courts must use to determine whether a federal constitutional violation in a criminal trial constitutes harmless error; however, states remain free, as a matter of their own law, to afford greater protections to their citizens than required by *Chapman* and classify fewer such violations as harmless. *Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978) ("Where a trial error violates the federal constitution, this Court, *at a minimum*, must employ the federal harmless error rule." (emphasis added)); *cf. Connecticut v. Johnson*, 460 U.S. 73, 81 n.9 (1983) (plurality) ("This Court held in *Chapman* that whether a federal constitutional error can be harmless is a federal question . . . . State courts, of course, are free to interpret their own constitutions and laws to permit fewer applications of the harmless error rule than does the Federal Constitution." (citation omitted)); *id.* at 88 (Stevens, J. concurring) ("[F]ederal law does not *require* a state appellate court to make a harmless error determination; it merely *permits* the state court to do so in appropriate cases. This is all the Court held in *Chapman*." (footnote omitted) (emphasis original)). Consequently, in accordance with these principles of federalism, we regard the tenets of *Chapman* and its progeny – *Fulminante*, *Weaver,* and

*McCoy* –as the minimum standards by which we are required to assess if a particular federal constitutional violation in a criminal trial is subject to a harmless error analysis.

Nevertheless, certification hearings such as the one in this case, which are conducted by a juvenile court under Section 6355 (a)(2) of the Juvenile Act, are not criminal trials. Evidence which is admitted at such hearings is not used to determine the juvenile's guilt of the offenses alleged in a delinquency petition. Rather, the sole purpose of a certification hearing, as established by the Juvenile Act, is to determine "if there is a *prima facie* case that the child committed the delinquent act alleged, the delinquent act would be considered a felony if committed by an adult, and if there are reasonable grounds to believe that the public interest would be served by the transfer of the case for criminal prosecution." *Commonwealth v. In re E.F.*, 995 A.2d 326, 329 (Pa. 2010). Thus, *Chapman* and its progeny, which were all cases involving the impact of a federal constitutional violation occurring during an adult criminal trial, do not explicitly govern the question of whether a federal constitutional violation which occurs in a certification hearing to criminal court should be subjected to harmless error analysis.

Since its *Chapman* decision, the high Court has not directly addressed the issue of whether violations of juveniles' rights under the United States Constitution that occur during proceedings conducted under a state's statutory framework for the handling of criminal offenses involving juveniles are subject to a harmless error analysis. However, the high Court has made it quite clear that, "[t]he possibility of transfer from juvenile court to a court of general criminal jurisdiction is a matter of great significance to the juvenile," and, thus, transfer proceedings must afford the juvenile fundamental constitutional protections. *Breed v. Jones*, 421 U.S. 519, 535 (1975). Further, we deem it significant that, one year prior to *Chapman*, the high Court in *Kent*, *supra*, suggested that a juvenile

court's failure to follow statutory requirements for transfer of cases to adult criminal court could not be considered a harmless error.

In that case, petitioner Morris Kent, then a juvenile, was arrested in the District of Columbia for breaking into a house, robbery, and rape. Because the applicable statute allowed waiver of such charges to the criminal district court, Kent's attorney filed a motion to retain the case in the juvenile court, to have access to the juvenile's social service treatment records, as well as reports of his probation officer, and to have a hearing. However, without granting the requested access or conducting a hearing, the juvenile court entered an order waiving the matter to the district court for trial. The juvenile subsequently appealed the waiver order, but the appeal was denied. After a jury trial in the district court, the juvenile was convicted and sentenced to 30 to 90 years imprisonment on those charges.

The high Court reversed, citing the juvenile court's failure to follow the established statutory procedures for waiver of a juvenile's case to adult criminal court, which failure the Court noted detrimentally impacted the juvenile's rights under the United States Constitution:

> It is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile . . . . The statutory scheme makes this plain. The Juvenile Court is vested with 'original and exclusive jurisdiction' of the child. This jurisdiction confers special rights and immunities. He is, as specified by the statute, shielded from publicity. He may be confined, but with rare exceptions he may not be jailed along with adults. He may be detained, but only until he is 21 years of age. The court is admonished by the statute to give preference to retaining the child in the custody of his parents 'unless his welfare and the safety and protection of the public can not be adequately safeguarded without . . . removal.' The child is protected against consequences of adult conviction such as the loss of civil rights, the use of adjudication against him in

> subsequent proceedings, and disqualification for public employment.
>
> The net, therefore, is that petitioner—then a boy of 16—was by statute entitled to certain procedures and benefits as a consequence of his statutory right to the 'exclusive' jurisdiction of the Juvenile Court. In these circumstances, considering particularly that decision as to waiver of jurisdiction and transfer of the matter to the District Court was potentially as important to petitioner as the difference between five years' confinement and a death sentence, we conclude that, as a condition to a valid waiver order, petitioner as (sic) entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision. *We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel*.

*Kent*, 383 U.S. at 556-57 (emphasis added and citations omitted).

The high Court further rejected a claim by the government that any harm to the juvenile was subsequently cured by the proceedings in the district court – which had addressed the issue of the propriety of the waiver by the juvenile court – and that the error of the juvenile court was rendered harmless as a result:

> [T]he waiver question was primarily and initially one for the Juvenile Court to decide and *its failure to do so in a valid manner cannot be said to be harmless error*. It is the Juvenile Court, not the District Court, which has the facilities, personnel and expertise for a proper determination of the waiver issue.

*Id.* at 564 (emphasis added) (citation and internal quotation marks omitted).

In our view, the *Kent* decision supports the general proposition that, where a juvenile court commits a federal constitutional violation in following the statutory procedures for determining whether the juvenile should be transferred to adult criminal court, the violation cannot categorically be treated as harmless. Moreover, as a general matter, our Court has previously applied the analytical framework of *Chapman* and its progeny in determining whether a violation of rights conferred by a Pennsylvania statute

was subject to harmless error review on appeal. *See In the Interest of J.M.G., supra* (applying *Chapman* to determine if violation of the psychotherapist-patient privilege in juvenile civil commitment hearings was subject to a harmless error analysis); *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (holding that trial court's error in failing to appoint counsel for the children in an involuntary termination of parental rights case was a structural error as defined in *Fulminante*). Consequently, for all of these reasons, we will apply the analysis set forth by the high Court in *Weaver* to determine whether the violation of Taylor's Fifth Amendment right by the juvenile court in conducting proceedings under our Juvenile Act is a structural error, or conversely, whether it is subject to harmless error review.

To reiterate, under *Weaver*, there are three categories of violations of a constitutional right in an adjudicative proceeding which will constitute a structural error: (1) when the constitutional right is one which does not protect against erroneous conviction, but instead protects some other interest; (2) when the effects of the violation are too hard to measure; or (3) when the violation will always result in fundamental unfairness. *Weaver*, 137 S.Ct. at 1908.

With respect to the first *Weaver* category of structural errors, we deem the nature of the right violated by the juvenile court — the Fifth Amendment right to be free from compulsory self-incrimination — to be one which is not only designed to protect a criminal defendant from erroneous conviction, but one which protects another vital interest — namely, the right of an individual to be shielded from coercion by those cloaked with official authority into providing facts or information which can then be used as evidence for his later prosecution and imprisonment.

As Justice Wecht recounted in his scholarly and comprehensive discussion of the Fifth Amendment in our Court's opinion in *Taylor II*, the Fifth Amendment was the

culmination of "painful opposition to a course of ecclesiastical inquisitions and Star Chamber proceedings" in England.[26] *Taylor II*, 230 A.3d at 1063 (quoting *Michigan v. Tucker*, 417 U.S. 433, 440 (1974)). As further detailed by Professor Wayne LaFave, these entities often employed forcible and otherwise odious practices to extract involuntary factual admissions from those who were the targets of their inquiries:

> Both of those prerogative tribunals were active in the persecution of religious and political dissidents, and both used an oath procedure to engage in roving inquiries. A person could be brought before the tribunal without any private accusation or charges file[d] against him, and there required to take an oath—the oath *ex officio*—to answer truthfully all questions that might be put to him. Refusal to take the oath could result in serious consequences, typically imprisonment for contempt or a fine, but in the case of the Star Chamber, corporal punishment (though not torture) was used on occasion.

LaFave, § 2.10(c) (footnotes omitted).

Revulsion at these practices was significant, including by the framers of the Bill of Rights, who sought to ensure that Americans would be protected against such evils by foreclosing the government's right to compel an accused's testimony within the Fifth Amendment. *Taylor II*, 230 A.3d at 1063 (citing *Brown v. Walker*, 161 U.S. 591 (1896)). As aptly described by Justice Musmanno:

> The framers of our Bill of Rights were too aware of the excesses possible in all governments, even a representative government, to permit the possibility that any person under the protection of the United States flag could be forced to admit to having committed a crime. In order to make the protection hazard-proof, the framers went beyond coercion of confessions. They used the all-embracive language that no one could be compelled 'to be a witness against himself'.

*Commonwealth v. Dravecz*, 227 A.2d 904, 907 (Pa. 1967).

---

[26] The Star Chamber was an English court of law that existed from the Fifteenth to Seventeenth Centuries. *Commonwealth v. Molina*, 104 A.3d 430, 445 n.14 (Pa. 2014) (plurality).

Today, the universal protections afforded by the Fifth Amendment have become an indispensable bulwark against the wrongful governmental deprivation of individual rights, and all courts have a solemn responsibility to enforce those protections. As our Court detailed in *Taylor II*:

> The Fifth Amendment stands between the citizen and his government." *Ullmann v. United States*, 350 U.S. 422, 454, 76 S.Ct. 497, 100 L.Ed. 511 (1956) (Douglas, J., dissenting); *see id.* at 445, 76 S.Ct. 497 ("The guarantee against self-incrimination ... is not only a protection against conviction and prosecution but a safeguard of conscience and human dignity and freedom of expression as well."); *cf. Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (noting that the "Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment"). When scrupulously observed, the privilege ensures that a "court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws." *Burr*, 25 F.Cas. at 40; *see Galbreath's Lessee v. Eichelbergher*, 3 Yeates 515, 516 (Pa. 1803). Because "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon," *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Fifth Amendment is to be "broad[ly] constru[ed] in favor of the right which it was intended to secure." *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892); *see Boyd*, 116 U.S. at 635, 6 S.Ct. 524 ("constitutional provisions for the security of person and property should be liberally construed"); *Quinn v. United States*, 349 U.S. 155, 162, 75 S.Ct. 668, 99 L.Ed. 964 (1955) (same).

*Taylor II*, 230 A.3d at 1063–64.

Forcing a juvenile to admit to having committed criminal offenses in certification proceedings in order to avail himself of the procedures and remedial measures otherwise available to him under the Juvenile Act disregards these principles. As cogently noted by the Superior Court below, such a compulsory requirement presents the juvenile with "a Hobson's choice: remain silent in the face of the certification judge's holding his silence

against him, or admit guilt at the certification hearing and have the Commonwealth almost certainly use his admission against him at trial." *Taylor III*, slip op. at 18. This untenable dilemma is undeniably coercive for the juvenile, and it has the effect of transforming the careful and orderly certification process contemplated by the Juvenile Act into a *de facto* criminal proceeding.

Pertinent to the second category of structural errors recognized in *Weaver* – whether the effects of the error are too hard to measure – as the Superior Court below recognized, a juvenile court's reliance on a juvenile's failure to admit guilt as a basis for its certification decision becomes "intertwined with the decision to certify the case." *Id.* at 19.[27] It is this entanglement which renders it impossible for an appellate court, on the basis of a cold record, to meaningfully assess its effect on the certifying judge's evaluation and weighing of the other evidence, due to the fact that the constitutional violation infected the juvenile court's entire decision-making process. As the high Court has made abundantly plain, in these types of circumstances when the effects of an error are too hard to measure, courts are not required to allow the state to attempt to demonstrate, through the use of other evidence, that the error was harmless, given that "the efficiency costs of letting the government try to make the showing are unjustified." *Weaver*, 137 S.Ct. at 1908.

Finally, regarding the third *Weaver* category of structural errors – where the violation will always result in fundamental unfairness – as discussed above, in certification hearings such as the one held by the juvenile court in this matter, a juvenile has the burden of proof under Section 6355(g) of the Juvenile Act to show by a preponderance of the evidence that the juvenile court's retention of his case "serves the public interest

---

[27] The Superior Court's general observation was amply supported by the juvenile court's indication on the record that this factor was paramount in its certification decision. *See* s*upra* pages 4-5.

and that [he] is amenable to treatment, supervision or rehabilitation as a juvenile." 42 Pa.C.S. § 6355(g). A juvenile court, as the ultimate finder of fact on the question of whether a juvenile is "amenable to treatment, supervision or rehabilitation," is obligated to give a fair and reasoned consideration to all of the competent evidence adduced at the certification hearing, and otherwise in its possession, involving the statutory factors enumerated in Section 6355(a)(4)(iii)(G) of the Juvenile Act.[28] Its ultimate conclusion regarding amenability must therefore rest on a dispassionate evaluation of the relative merits of the evidence properly before it pertaining to those factors.

However, whenever a juvenile court violates a juvenile's Fifth Amendment right by, in effect, conditioning its ultimate finding of the juvenile's amenability to treatment, supervision, and rehabilitation upon a requirement that the juvenile admit guilt for the offenses he is alleged to have committed, we conclude this results in a "fundamental unfairness" in the certification process. *Weaver*, 137 S.Ct. at 1903. By imposing such a manifestly improper requirement, a juvenile court has, in effect, created an irrebuttable presumption that, if the juvenile refuses to incriminate himself, he is not amenable to treatment, supervision, and rehabilitation, no matter what the other competent evidence of record demonstrates. At the very least, the juvenile's failure to admit guilt will invariably weigh heavily and negatively on the juvenile court's evaluation of the other evidence on this question. Indeed, its pernicious impact is amplified in proceedings such as this one, given that a juvenile in Taylor's situation had the burden of proof under the Juvenile Act to demonstrate his amenability to treatment, supervision, and rehabilitation; consequently, a juvenile court's emphasis on the child's failure to admit guilt in these situations imposes a nearly insurmountable obstacle to his ability to carry that burden. This type of constitutional violation therefore inevitably disrupts the framework of the

---

[28] See s*upra* note 18.

certification process because of its distortive effect on the entirety of the juvenile court's decision-making process. *Cf. Fulminante*; *Greer*, 141 S. Ct. at 2100 (structural errors affect the entire conduct of a trial from beginning to end).

For all of these reasons, we conclude that the constitutional violation committed by the juvenile court in this matter constituted a structural error in accordance with the principles articulated in the high Court's decisions in *Chapman* and its progeny.

Our conclusion is also supported by this Court's precedent finding a particular practice or conduct occurring in our Commonwealth's courts that significantly and deleteriously impacts the exercise of fundamental rights constitutes structural, or what we have sometimes alternatively termed "*per se,*" error.[29] *See*, *e.g.*, *Kelly*, *supra* (holding that the trial court's use of a jury instruction that created a mandatory presumption which permitted the finder of fact to conclude a material element of a criminal offense was established, without requiring the Commonwealth to prove that element beyond a reasonable doubt, was a violation of the defendant's due process rights under the United States Constitution to have a jury determine his guilt beyond a reasonable doubt, and further determining that the violation would not be subject to a harmless error analysis, even though the United States Supreme Court had not definitively ruled on that question); *In the Interest of J.M.G.*, 229 A.3d at 583 (application of a harmless error analysis to violation of the psychotherapist-patient privilege in juvenile civil commitment hearings was inappropriate given that "we deem scrupulous adherence to the . . . privilege to be basic to fair Act 21 proceedings") (citing *Chapman*, 386 U.S. at 23)); *In re Adoption of L.B.M.*, 161 A.3d at 183 (holding that trial court's error in failing to appoint counsel for children in involuntary termination of parental rights case constituted a structural error in accordance

---

[29] As both designations describe the same type of error, for purposes of clarity, we will hereinafter refer to these errors as structural.

with *Fulminante's* definition of the term because it "compromises the framework of the proceedings" established statutorily by the General Assembly).

Of particular relevance to the harmless error question presented by the case *sub judice*, our Court has opined, as a matter of Pennsylvania law, that whenever a trial court penalizes an individual for exercising his or her constitutional rights, and then relies on that penalization as part of its decision-making process, the error is not *de minimis* and cannot be cured by permitting appellate courts to find other evidence of record to support the trial court's decision. In *Bethea*, *supra*, the trial court sentenced a defendant for criminal offenses based, in part, on the defendant's refusal to plead guilty to the offenses, and, instead, to proceed to a jury trial, as was his right under the United States and Pennsylvania Constitutions. In fashioning its sentence, the trial court suggested that, had the defendant pled guilty, this plea would have resulted in the judge imposing a more favorable sentence, as it would signify his acceptance of responsibility for his actions. *See* 379 A.2d at 106 ("[I]t might have shown me the right side of your attitude about this, but you pled not guilty, fought it all the way, and the jury found you guilty."). The trial court also stated in its sentencing opinion that it had relied on other factors such as the nature of the crimes and the defendant's lack of remorse.

Our Court reversed the judgment of sentence and found the mere existence of other evidentiary factors of record to support the sentence to be insufficient to overcome the trial court's penalization of the defendant for the exercise of his constitutional rights. Although our Court did not formally label the trial court's error as "structural" in our decision, we nevertheless treated it as such, given that we deemed the error to be sufficient, in and of itself, to invalidate the defendant's sentence and require remand for a resentencing hearing, irrespective of the other evidence of record:

> [A]ny increase in sentence which results from a defendant's
> decision to put the state to its proof puts a price upon the

exercise of a fundamental constitutional right, and hence is unjustified. Thus, a sentence based in part on an impermissible consideration is not made proper simply because the sentencing judge considers other permissible factors as well. In deciding whether a trial judge considered only permissible factors in sentencing a defendant, an appellate court must, of necessity, review all of the judge's comments. Moreover, in making this determination it is not necessary that an appellate court be convinced that the trial judge in fact relied upon an erroneous consideration; it is sufficient to render a sentence invalid if it reasonably appears from the record that the trial court relied in whole or in part upon such a factor.

*Id.* at 106-07.

Furthermore, consistent with our Court's constitutionally based supervisory responsibility for the Pennsylvania judicial system,[30] we have categorically exempted certain trial court errors which impact a defendant's Fifth Amendment right from appellate review for harmless error in order to ensure the timely administration of justice. In *Commonwealth v. Edwards*, 637 A.2d 259, 260 (Pa. 1993), our Court considered the question of whether the trial court's issuing a "no adverse inference" instruction to the jury regarding a defendant's failure to testify, over his objection, was error, and, if so, could it be considered harmless. In addressing this question, we noted that the United States Supreme Court held in *Lakeside v. Oregon*, 435 U.S. 333 (1978), that the giving of such an instruction against a defendant's wishes did not violate his Fifth Amendment protection against self-incrimination; however, the high Court stated that state courts were free to forbid trial judges from engaging in this practice.

---

[30] *See* Pa. Const. art. V, § 10(a) ("The Supreme Court shall exercise general supervisory and administrative authority over all the courts.").

Our Court noted that a number of other states had already adopted such a rule, and, because we deemed it to be a necessary protection for the defendant's fundamental right to choose how to proceed with his defense, we adopted it. Notably, for present purposes, our Court also chose to make a trial judge's violation of this new rule "*per se* reversible error." *Edwards*, 637 A.2d at 261. We explained, "[a] *per se* rule will avoid time consuming appeals arguing about harmless error and will clearly instruct trial judges as to how to proceed on this question." *Id.*

We find this rationale to be even more compelling in regard to the type of Fifth Amendment violation at issue in this case. Juvenile proceedings are, by their very nature, time sensitive, given that the Juvenile Act no longer applies to individuals when they reach the age of 21. 42 Pa.C.S. § 6302(2). Thus, there is a unique risk that appeals in this context, if they include the time-consuming question of whether a particular error is harmless, will deprive juveniles and society of the protections afforded by the Juvenile Act, because they may not be adjudicated before the juvenile ages out of the juvenile system.

Accordingly, our own precedent supports the conclusion that a juvenile court's penalization of a juvenile for exercising his Fifth Amendment right to be free from compulsory self-incrimination in juvenile certification proceedings is of such gravity that it constitutes a structural error which cannot be cured by appellate evaluation of other evidence of record regarding the juvenile's amenability to treatment, supervision, and rehabilitation. Therefore, we conclude that the juvenile court's violation of Taylor's Fifth Amendment right constituted structural error.

## III. Remedy for the constitutional violation committed by the juvenile court

Having found the juvenile court's violation of Taylor's Fifth Amendment right to be free from compulsory self-incrimination constituted an automatically reversible structural error, we must now consider the appropriate remedy.

## A. Argument

The Commonwealth proposes that we remand this matter to the Montgomery County Court of Common Pleas to "render an assessment" of the original certification without the improper consideration the juvenile court relied on. Commonwealth Brief at 37. Specifically, the Commonwealth suggests that:

> [a] judge of the court of common pleas should review the certification hearing records without considering [Taylor's] denial, and render a new decision on whether [he] satisfied his burden of proving it was appropriate to retain his case in the juvenile division. If not, then the conviction stands, and if so, then [Taylor] is discharged.

*Id.* at 41-42.[31]

The Commonwealth argues that both the Pennsylvania Constitution and relevant statutes enacted thereunder provide the Montgomery County Court of Common Pleas with unlimited original jurisdiction to reconsider the question of whether Taylor was properly certified to be tried as an adult, based on the existing evidentiary record of the certification hearing, but without consideration of Taylor's failure to admit guilt of the offenses charged.

The Commonwealth contends that its position is supported by the historical evolution of the governing Pennsylvania constitutional and statutory provisions, noting that, prior to 1972, the 1933 Juvenile Court Law, 11 P.S. § 244 (repealed),[32] gave juvenile

---

[31] However, the Commonwealth has, alternatively, indicated that it "sees no issue with [the] criminal division holding a certification hearing *nunc pro tunc* to determine whether a prior certification order was appropriate under the provisions of the Juvenile Act . . . ." Commonwealth Reply Brief at 11.

[32] *See* June 2, 1933 P.L. 1433, No. 311 § 2, repealed 1972, Dec. 6, P.L. 1464, No. 333, § 40.

courts "full and exclusive jurisdiction in all proceedings affecting delinquent . . . children."

It observes that this exclusive grant of jurisdiction was altered after the voters adopted

Article V, Section 5 of the Pennsylvania Constitution in 1968, which gave courts of

common pleas in each judicial district "unlimited original jurisdiction in all cases except as

may otherwise be provided by law." Commonwealth Brief at 26 (quoting Pa. Const. art.

V, § 5(b)). The Commonwealth recounts that, on July 9,1976, the legislature passed the

Juvenile Act, "in view of the recent *consolidation of original jurisdiction* solely in the several

courts of common pleas by Section 5 of Article V of the Pennsylvania Constitution, as

amended [in] 1968." *Id.* at 27 (quoting 42 Pa.C.S. § 6301, Joint State Government

Committee Comment) (emphasis added by the Commonwealth). The Commonwealth

highlights that, on the same date, the legislature passed 42 Pa.C.S. § 952 which provides,

in relevant part, that "[i]n a court of common pleas having two or more divisions each

division of the court is vested with the full jurisdiction of the whole court." Commonwealth

Brief at 27 (quoting 42 Pa.C.S. § 952). Later, in 1980, 42 Pa.C.S. § 931 was enacted,

which provides that, unless jurisdiction is "vested in another court of this Commonwealth,

the courts of common pleas shall have unlimited original jurisdiction of all actions and

proceedings." Commonwealth Brief at 28 (quoting 42 Pa.C.S. § 931).

In the Commonwealth's view, the collective import of Sections 931 and 952 is to

provide the court of common pleas in a particular judicial district with unlimited jurisdiction

over all actions and proceedings, unless original jurisdiction over the action or proceeding

lies in another court. The Commonwealth interprets our Court's statement in *Johnson*,

*supra*, that the juvenile division of the court of common pleas is vested with "exclusive

jurisdiction" ‒ which was relied on by the Superior Court in this matter ‒ as not supported

by these statutory provisions, as nowhere in those enactments is the phrase "exclusive

jurisdiction" used, as it was in the now repealed Juvenile Court Law. *Id.* at 29.

From the Commonwealth's perspective, the correct understanding of these statutes, when read in conjunction with the Juvenile Act, is as our Court held in *Commonwealth v. Greiner*, 388 A.2d 698 (Pa. 1978): that "whenever possible" the provisions of the Juvenile Act "should control in resolving matters pertaining to juveniles." *Id.* at 701. However, in situations where it is not possible to apply the provisions of the Juvenile Act, such as in the present case, then the Commonwealth argues that Section 931 functions as a "catch-all for original jurisdiction" which makes jurisdiction proper in the court of common pleas, and Section 952 permits a criminal court, as a division of that court, to exercise its full jurisdiction. Commonwealth Brief at 30. Accordingly, the Commonwealth posits that the Superior Court erred in finding that no court has jurisdiction to conduct certification proceedings on remand, and it contends that there is no need to resort to the "drastic relief" of discharging Taylor. *Id.* at 35.[33]

---

[33] The Attorney General's *amicus* brief supports the Commonwealth's position that the court of common pleas has jurisdiction to conduct further proceedings. The Attorney General maintains that, though the General Assembly was empowered by Article V, Section 8 of the Pennsylvania Constitution to "establish additional courts or divisions of existing courts, as needed," Attorney General Brief at 16 (quoting Pa. Const. art .V, § 8), the General Assembly never utilized that power to create a separate juvenile court and vest it with exclusive jurisdiction. To the contrary, the Attorney General, like the Commonwealth, highlights that 42 Pa.C.S. § 6301, which sets forth the purposes of the Juvenile Act, specified, as noted in the Joint State Government Committee comment to 42 Pa.C.S.§ 6301, that it was enacted in accordance with Article V's "consolidation of original jurisdiction solely in the several courts of common pleas." *Id.* (quoting 42 Pa.C.S. § 6301, comment). Thus, in the Attorney General's view, this is indicative of the legislature's intent to consolidate jurisdiction over all matters, including juvenile actions, in the courts of common pleas.

The Attorney General argues that this intent is buttressed by the Juvenile Act's definition of court as "[t]he court of common pleas," 42 Pa.C.S. § 6302, and the fact that sections 6322 and 6355 of the Juvenile Act refer, respectively, to transfers to and from "criminal proceedings," not a specific court. *Id.* at 17 (quoting 42 Pa.C.S. §§ 6322 and 6355). The Attorney General further asserts that, when a matter is certified for criminal proceedings under Section 6355(b), it terminates the applicability of that chapter of the Juvenile Act, and the "offense" is transferred to "the division or a judge of the court . . . assigned to conduct criminal proceedings," *id*. (quoting 42 Pa.C.S. § 6355(a)), but it does
(continued…)

Taylor responds by acknowledging that both the Pennsylvania Constitution and relevant statutes enacted thereunder give the court of common pleas jurisdiction over this matter, and that the court of common pleas, as a general rule, has unlimited original jurisdiction. However, Taylor disagrees with what he characterizes as the Commonwealth's assertion that the adult criminal division and the juvenile divisions of the courts of common pleas are entirely separate courts, rather than parts of the Unified Judicial System of the Commonwealth. While Taylor agrees that there is no separate juvenile court in Pennsylvania, he suggests that the Commonwealth is improperly attempting to keep this case within the jurisdiction of the adult criminal court, which he

---

not terminate jurisdiction, given that the court, *i.e.*, the court of common pleas, continues to retain jurisdiction as it did from the outset.

The Attorney General contends that, similarly, when a matter is transferred from criminal proceedings under Section 6322, it is not transferred to a different court but, rather, "to the division or a judge of the court . . . assigned to conduct juvenile hearings." *Id.* (quoting 42 Pa.C.S. § 6322). Conversely, when a matter is transferred to criminal court, Section 6355(b) "terminates the applicability of [the Juvenile Act] over the child with respect to the delinquent acts alleged in the petition;" nevertheless, the court of common pleas still has jurisdiction as the matter is transferred "to the division or a judge of the court . . . assigned to conduct criminal proceedings," which is the court of common pleas. *Id.* (quoting 42 Pa.C.S. § 6355(a),(b)) (internal quotation marks omitted). Thus, from the Attorney General's perspective, this demonstrates that the Juvenile Act does not create separate common pleas and juvenile courts, but rather they are one in the same — the court of common pleas.

The Attorney General posits that our Court's comments in *Johnson* about juvenile courts, or divisions of the courts of common pleas, having exclusive jurisdiction over juvenile matters were merely *dicta*. In any event, the Attorney General agrees that the Juvenile Act ceases to apply to individuals like Taylor who are over the age of 21; however, it is not a statute of limitations entitling Taylor to dismissal of the case against him. The Attorney General suggests that, if we find the Fifth Amendment violation prejudicial, the appropriate remedy would be to remand and grant Taylor a "retrospective certification hearing," or a new trial. *Id.* at 7.

The Pennsylvania District Attorneys Association in its *amicus* brief largely mirrors the arguments of the Commonwealth and the Attorney General: because the common pleas court has jurisdiction over Taylor, the matter could be remanded to the court of common pleas so that it can conduct a new hearing to determine if the original certification was proper.

contends never acquired jurisdiction in the first place because his case was improperly certified to it.

Taylor asserts that the Superior Court below properly followed our Court's pronouncement in *Johnson* that matters involving transfer between the criminal and juvenile divisions are jurisdictional in nature, such that, if the transferring court's order was improper, the receiving court never acquired jurisdiction. He maintains that the Superior Court properly recognized that, because the juvenile court's order in the instant matter certifying the case was improper, the Montgomery County Court of Common Pleas never had jurisdiction to try him and, hence, the verdict rendered in the criminal trial was invalid.

He reasons that the only way the court of common pleas could acquire jurisdiction would be if the juvenile court issued a valid certification order. However, Taylor argues the juvenile court no longer has jurisdiction to issue such an order because of his age, and the adult criminal court has no jurisdiction over certification decisions. Hence, he insists he is entitled to discharge.

Taylor acknowledges that, generally, after a juvenile is tried and convicted in adult criminal court because of an improper certification order, vacating the judgment of sentence and remanding to the juvenile court is the appropriate procedure, citing *Greiner*, *supra*; however, Taylor points out that remand was possible in *Greiner* only because the juvenile had not yet turned 21 and, unlike Taylor, had not "aged out of the system." Taylor Brief at 46.

Taylor also proposes that the remedy provided by the United States Supreme Court in *Kent* — remanding to the district court for a new hearing on the question of whether the juvenile court's original waiver of the case to the district court was appropriate — is not

possible in his case because, unlike the district court in that case, the criminal division of the court of common pleas has jurisdiction only over adults.[34]

---

[34] *Amicus* Defender Association of Philadelphia recounts that, historically, in Pennsylvania and other jurisdictions, there has always been a separation between adult criminal proceedings and those involving juveniles, due to the recognition that, as a general matter, children should be shielded from adult prosecutions due to their unique developmental status and special needs. The Defender Association argues that, while the present version of the Juvenile Act no longer specifically establishes juvenile courts, consistent with the legislature's intent, there nevertheless remains a jurisdictional divide between the criminal division of the courts of common pleas, and the juvenile division.

*Amicus* asserts that allowing the criminal division of the Montgomery County Court of Common Pleas to hold a certification hearing under 42 Pa.C.S. § 6355 would contravene that separation of responsibility, and is prohibited by the Juvenile Act itself. The Defender Association argues that Section 6303(a) of the Juvenile Act provides that it "shall apply exclusively to . . . [p]roceedings in which a child is alleged to be delinquent." Defender Association Brief at 25 (quoting 42 Pa.C.S. § 6303(a)). Thus, the Defender Association reasons that the plain import of this language is to bar the Juvenile Act from applying to individuals who are not children, and, therefore, no certification hearing can ever be held for an adult under Section 6355.

The Defender Association posits that a contrary conclusion would subvert the entire statutory certification process, given that, from its perspective, all cases in which a certification hearing was not held would simply be immediately transferred to criminal court. Moreover, the Defender Association contends that the interpretation offered by the Commonwealth and the Attorney General would encourage "gamesmanship" in the appellate process. *Id.* at 27. The Defender Association contends that the practical effect would be to encourage many more interlocutory appeals by the Commonwealth of orders denying certification, and, correspondingly, more cases in which appeals would not be decided before the juvenile attains the age of 21, which would inure to the Commonwealth's benefit, as the juvenile would then be subjected to criminal court proceedings.

The Defender Association suggests that the better remedy for situations such as this one is for the General Assembly to adopt a legislative solution, as states including California, Vermont, and Maryland have done.

In its *amicus* brief, the Juvenile Law Center argues that release is the most appropriate remedy for a juvenile such as Taylor who has suffered a deprivation of his Fifth Amendment right. In its view, release would be consistent with the recognition that, as juveniles mature, they are far more capable of becoming "productive and law-abiding citizens," which has been borne out by social science research. Juvenile Law Center Brief at 21 (citing *Miller*, *supra*).

Moreover, *amicus* proffers that release is the only remedy that can protect children from future violations of this nature. It avers that, in the modern criminal justice system, most cases, including those of juveniles, are resolved by plea deals. That fact, coupled (continued…)

## B. Discussion

Guided by these thoughtful arguments, we now address the question of the appropriate remedy for the juvenile court's violation of Taylor's Fifth Amendment right to be free from compulsory self-incrimination, which, as we have determined, was a structural error in the certification proceedings. We first consider what effect this error had on the original certification order. As we have discussed, a constitutional violation which occurs in the course of a criminal trial that constitutes a structural error necessitates the reversal of a criminal conviction and remand for a new trial. *See McCoy*, *supra*. Likewise, a structural error which occurs during a judicial proceeding such as a sentencing hearing necessitates reversal of the judgment entered in that proceeding and remand for a new hearing. *Bethea*, 379 A.2d at 107. Here, the constitutional violation which constituted the structural error occurred during Taylor's certification hearing, and, thus, that structural error rendered the juvenile court's certification order, which was the product of that hearing, void.

Furthermore, Taylor's criminal conviction was the direct result of the criminal trial in the court of common pleas that followed this improper certification; and, because the certification order was void, that court acted without authority to try Taylor as an adult. Therefore, Taylor's judgment of sentence entered as the result of his conviction must be vacated. *See Greiner*, 388 A.2d at 698.

In situations where juveniles successfully challenge the certification order of the juvenile court on appeal after their trial and conviction in adult criminal court, and are still

---

with the lengthy nature of the appellate and collateral review process for criminal convictions, means that constitutional violations of this nature are not likely to be meaningfully addressed, and, if they are addressed on appeal or collateral review, there is a significant chance the juvenile will, as in the instant matter, have aged out of the juvenile system and forever lost the benefits of its rehabilitative aspects. Further, the juvenile will have been exposed needlessly to the harsh and damaging effects of the adult penal system.

under the age of 21, it is well-established that the proper course of action is to remand the case to the juvenile court for a new certification hearing, as our Court did in *Greiner*. *See also Commonwealth v. Lux,* 445 A.2d 185 (Pa. Super. 1982) (when record did not indicate that juvenile division judge properly considered child's amenability to treatment, supervision, or rehabilitation when certifying his case for trial in adult criminal court, case was remanded for a new certification hearing, and judgment of sentence entered after trial was vacated, pending the outcome of the new certification hearing); *Commonwealth v. Stokes*, 421 A.2d 240 (Pa. Super. 1980) (same). However, again, Taylor is no longer a juvenile; consequently, we must ascertain whether the Juvenile Division of the Court of Common Pleas of Montgomery County has jurisdiction to conduct a new certification hearing, or, if it does not, whether the Criminal Division of that court may do so as the Commonwealth has argued.

Resolution of these questions is governed by the Juvenile Act, as well as those provisions of the Judicial Code which generally establish the jurisdiction of the courts of our Commonwealth. In such matters of statutory interpretation,

> [W]e are guided by the polestar principle that we must ascertain and effectuate the intent of the General Assembly in enacting the statute[s]. *See* 1 Pa.C.S.A. § 1921(a). In so doing, we must give effect to all of the provisions. *Id.* Further, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). Generally, the best indication of the General Assembly's intent in enacting a statute may be found in its plain language.

*Commonwealth v. M.W.*, 39 A.3d 958, 963-64 (Pa. 2012).

Our Commonwealth's Constitution provides that the courts of common pleas have "unlimited original jurisdiction in all cases except as may otherwise be provided by law." Pa. Const. art. V, § 5. Pursuant to this provision, the General Assembly has delineated

the jurisdiction of our trial courts in Section 931(a) of the Judicial Code, which provides that:

> Except where exclusive original jurisdiction of an action or proceeding is by statute or by general rule adopted pursuant to section 503 (relating to reassignment of matters) vested in another court of this Commonwealth, the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings, including all actions and proceedings heretofore cognizable by law or usage in the courts of common pleas.

42 Pa.C.S. § 931(a).

Consequently, "the courts of common pleas have unlimited original jurisdiction of all actions, except where otherwise provided by law." *Domus, Inc. v. Signature Building Systems of Pennsylvania., LLC*, 252 A.3d 628, 636 (Pa. 2021); *see also In re Admin. Ord. No. 1-MD-2003*, 936 A.2d 1, 6 (Pa. 2007) ("[T]he courts of common pleas are granted '*unlimited* original jurisdiction' in '*all* actions and proceedings' not exclusively vested elsewhere." (emphasis original)).

Pertinently, Section 6303(a) of the Juvenile Act delineates that the provisions thereof apply "exclusively" in "[p]roceedings in which a child is alleged to be delinquent or dependent." 42 Pa.C.S. § 6303(a)(1). Further, as discussed previously, Section 6302 of the Juvenile Act expressly defines a "child" as an individual who:

> (1) is under the age of 18 years;
>
> (2) is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years; or
>
> (3) is under the age of 21 years and was adjudicated dependent before reaching the age of 18 years, who has requested the court to retain jurisdiction and who remains under the jurisdiction of the court as a dependent child.

*Id.* § 6302. An act of delinquency is defined, in relevant part, as an "act designated a crime under the law of this Commonwealth." 42 Pa.C.S. § 6302.

Manifestly, then, the Juvenile Act applies exclusively to all proceedings in which a "child", as defined, is alleged to be delinquent or dependent. Such individuals are entitled to the protections afforded by the Act.

As noted, in delinquency cases involving individuals who meet the definition of a "child" under the Juvenile Act, Section 6355 establishes the exclusive procedures by which the juvenile court decides if the individual's delinquency case may be transferred to adult criminal court, *i.e.*, certified for "criminal proceedings," 42 Pa.C.S. § 6355, rather than proceed as a delinquency hearing before the juvenile court.[35] When the plain language of this provision is considered in conjunction with the above-discussed provisions of the Juvenile Act specifying its jurisdictional scope, we conclude it was the intent of the General Assembly that the procedure set forth in Section 6355 is applicable *only* when the subject of the certification hearing is a child. Here, Taylor is no longer a

---

[35] With respect to the term "court" as used in this section, we agree with the Commonwealth that the adoption of the Juvenile Act by the General Assembly, pursuant to its authority under Article V, Section 5 to establish, by law, the jurisdiction of the courts of common pleas, eliminated separate juvenile courts, as had been formerly created in 1933 by the Juvenile Court Law. The Juvenile Act now specifies that the courts of common pleas are the courts which are to address criminal matters involving juveniles. See 42 Pa.C.S. § 6302 (defining court as "[t]he court of common pleas"); *see also Commonwealth v. Wadzinski*, 401 A.2d 1129, 1132 (Pa. 1978) (observing that, after the voters adopted Article V which reconstituted the court of common pleas, it "possesses the jurisdictions of the former . . . juvenile courts").

Hence, the term "juvenile court" is properly understood to be a reference, generally, to the juvenile division of the courts of common pleas, as that is the prevalent court structure in more populous counties in our Commonwealth. *See generally Johnson, supra* (explaining Juvenile Act's provisions governing transfer of murder case between criminal and juvenile divisions of the courts of common pleas). In counties of smaller population, with a correspondingly smaller complement of common pleas judges, a common pleas court judge will also handle juvenile matters, often on separately scheduled "juvenile days." Zanan, *Pennsylvania Juvenile Delinquency Law*, 6 (2014 ed.). By custom, however, "whenever a Court of Common Pleas is hearing a juvenile matter, it is referred to as a 'juvenile court'." *Id.*

child; thus, Section 6355 provides no authority for the juvenile court to conduct a new certification hearing for him. *See Commonwealth v. Armolt*, 294 A.3d 364, 372-73 (Pa. 2023) (reaffirming that Juvenile Act's grant of jurisdiction to juvenile court over offenders extends only to those persons who are prosecuted for offenses they are alleged to have committed while under the age of 18, and for which they are prosecuted before the age of 21, but the juvenile court loses jurisdiction over such individuals after they turn 21).

While the Commonwealth recognizes the existence and effect of these statutory provisions in barring the juvenile court from conducting a new certification hearing in this matter, it seeks to avoid their application, contending that the criminal division of the court of common pleas is empowered to conduct such a hearing. We are constrained to reject that assertion, as it lacks statutory foundation.

As our Court explicitly held in *Johnson*, *supra*, other divisions of the court of common pleas do not have jurisdiction over matters arising under the Juvenile Act which our legislature has exclusively committed to the juvenile division of the court of common pleas. *See Johnson*, 669 A.2d at 320 ("[T]he Juvenile Act is the type of legislation which exemplifies the legislature's desire to vest limited and exclusive jurisdiction in one division of the court of common pleas in order to meet the special needs of our youth."). Consequently, as Section 6355 of the Juvenile Act grants *only* the juvenile court the power to conduct certification hearings, another division of the court of common pleas, such as the criminal division, has no statutory authority to do so.[36]

---

[36] We must also reject the Commonwealth's alternative suggestion that the criminal division of the Court of Common Pleas of Montgomery County could, on remand, review whether Taylor's initial certification was proper under the criteria enumerated in Section 6355(a)(4)(iii)(G) of the Juvenile Act, by considering only the transcript of the original (continued…)

The high Court's decision in *Kent, supra*, does not offer an alternative. In that matter, the criminal court in D.C. *was* empowered by statute to conduct certification hearings in situations where, as here, an individual's case began in the juvenile court system, but the individual "aged out" of the juvenile system while his or her ultimately successful challenge to the certification of their case to adult criminal court was pending on appeal, necessitating a new certification hearing. Likewise, we acknowledge that some of our sister states, such as California, impose no age cap on the jurisdiction of their juvenile courts over individuals who are alleged to have committed criminal offenses as a child, *see* Cal. Wel. & Inst. §§ 602, 604, 606, 707, while other states like Maryland explicitly permit their juvenile courts to consider certification questions even after the alleged juvenile offender has turned 21, *see* Md. Cts. & Jud. Pro. § 3-8A-07.

We cannot, however, judicially rewrite the comprehensive statutory framework of the Juvenile Act to provide similar solutions in the instant matter. *See Sivick v. State Ethics Commission*, 238 A.3d 1250, 1264 (Pa. 2020) ("It is axiomatic that we may not add statutory language where we find the extant language somehow lacking."). Rather, it is solely within the purview of the General Assembly, as the architect of the Juvenile Act, to

proceedings and other competent evidence adduced during the original certification hearing, but without consideration of Taylor's refusal to waive his Fifth Amendment right. The Commonwealth cites no statutory authority, nor do we independently discern any, enabling the court of common pleas to conduct what is essentially *de facto* appellate review as a substitute for a *de novo* certification hearing, the latter of which is what the Juvenile Act expressly guaranteed Taylor as a child, but which he was wrongly denied.

Moreover, as we have discussed above, because the constitutional violation committed by the juvenile court was a structural error so entwined with its ultimate determination regarding whether Taylor was amenable to treatment, supervision, and rehabilitation, as we have explained above, judicial parsing of a cold record to find other evidence in support of the juvenile court's decision is not a suitable means of correcting an error of this nature. *See Weaver, supra*; *Bethea, supra*.

furnish such remedies, if it so chooses. Given that, under the Juvenile Act as presently framed, there is no court empowered to conduct a new certification hearing as Taylor is no longer a juvenile, we must follow the law as currently written, and, thus, we agree with the Superior Court that dismissal of this case is the only remedy under these circumstances. Accordingly, we affirm the order of the Superior Court, and discharge Taylor.

Order affirmed. Appellant is discharged.

Justices Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a dissenting opinion.

Justice Brobson files a dissenting opinion.